**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DITRICT OF COLUMBIA**

_____

| | |
|---|---|
| **CASANDRA SMITH,** | ) |
| **4583 Waterford Drive** | ) |
| **Concord, North Carolina 28027** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case No. 15-cv-472** |
| | ) |
| **MARIA CONTRERAS-SWEET,** | ) |
| **Administrator of the Small** | ) |
| **Business Administration,** | ) |
| **409 3rd Street, S.W., Suite 7000** | ) |
| **Washington, D.C. 20024** | ) |
| | ) |
| **Defendant.** | ) |

_____ )

## COMPLAINT

Plaintiff CaSandra Smith, by and through her undersigned counsel, hereby files this Complaint against Maria Contreras-Sweet, as the Administrator of the Small Business Administration (hereinafter, "SBA" or the "Agency") for violations of Title VII of the Civil Rights Act of 1964 (hereinafter, "Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq*.

### PARTIES & JURISDICTION

1.      Ms. Smith is an African American female and is a resident of Concord, North Carolina.  At all relevant times to this Complaint, Ms. Smith has been employed by the SBA in the Agency's Government Contracting and Business Development (hereinafter, "GCBD") office. While Ms. Smith's Duty Station is located in North Carolina, she reports to the GCBD's headquarters in the District of Columbia.

2.      Defendant Maria Contreras-Sweet is the Administrator of the SBA, an agency as that term is defined in 5 U.S.C. § 552a(a)(1) for the purpose of 42 U.S.C. § 2000e-16(a).

3.      Jurisdiction is proper in this Court pursuant to 42 U.S.C. § 2000e-16(c) and 28

U.S.C. § 1331 relating to "any civil action or proceeding arising under any Act of Congress

regulating commerce."

4.      Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C.

§ 1391(b), as Defendant is the head of a governmental agency of the United States that does

business in and is headquartered in the District of Columbia, Ms. Smith reported to the Agency's

GCBD office located in the District of Columbia, many decisions made and events giving rise to

this action occurred in the District of Columbia, and key documents, including employment

records, and witnesses are located in the District of Columbia.

5.      Ms. Smith filed her formal complaint with the SBA Office of Diversity, Inclusion,

and Civil Rights (hereinafter, "EEO Office") on December 30, 2013, alleging discrimination on

the basis of race and sex.  Ms. Smith supplemented and amended her complaint to include

retaliation on February 25, 2014.  It has now been more than 180 days from the date her

complaint was filed, and no final decision has been rendered. Accordingly, Ms. Smith exhausted

her administrative remedies and may pursue her claims in this Court. 42 U.S.C. § 2000e-16(c).

## FACTS

6.      Ms. Smith's career with the SBA spans 25 years.  She originally joined the SBA

in 1989 as a Clerk Typist and has repeatedly received promotions, working herself up through

the Agency until December 31, 2008, when she was promoted to a GS-13 Program Analyst

position.

7.      As Program Analyst, Ms. Smith's first line supervisor was Mr. Robert Watkins,

an African American male.  Mr. Watkins had supervisory and hiring authority over the GCBD

unit.

8.      Ms. Smith is a highly qualified and exceptional employee.  She has 25 years of experience in the Agency, including more than a decade of managerial experience, has a Master's Certification in Acquisition and Contracting, Senior Level III certification for Project/Program Management, Mid-Level II certification for Contracting Officer's Representative, and has been designated as a Subject Matter Expert for government contracting and business development by GCBD Management.

9.      Ms. Smith's exceptional work is reflected in her consistently outstanding performance reviews.  In fact, Ms. Smith received perfect scores of 5/5 for her annual review for each of the two years preceding the events giving rise to this action and overall Outstanding ratings for approximately the past decade.  Ms. Smith, at all times, met the Agency's legitimate expectations for her position.

10.     Despite her exceptional performance with the Agency, beginning in 2010, Ms. Smith was suddenly subjected to a pattern of discrimination on the basis of her status as an African American female.  Ms. Smith was consistently and repeatedly assigned high level tasks without appropriate promotion or compensation, denied promotions to positions for which she was the most qualified candidate, denied important training opportunities necessary for her career advancement, and blocked from critical meetings involving projects to which she was assigned.  In stark contrast, other Agency employees who were not African American females were not treated in the same, discriminatory manner.

11.     After performing GS-13 Program Analyst duties for a year and a half, on August 4, 2010, Ms. Smith was assigned the duties of a former GS-14 Project Manager, Mr. Larry Gottlieb.  Specifically, she assumed Project Manager functions for the Business Development Management Information System (hereinafter, "BDMIS").  Ms. Smith was given the title of

"Acting Project Manager" and assigned the full workload of the GS-14 position, in addition to her GS-13 Program Analyst Duties.  Despite the increased workload and higher level responsibilities, Ms. Smith's job description was not officially changed and her compensation remained the same.

12.     Subsequently, in 2011, Ms. Smith was also assigned the duties of another GS-14 employee, Ms. Jacqui West, for the E8(a) Annual Review System when Ms. West transferred from the division.  Again, despite the increased workload and assignment of GS-14 duties, Ms. Smith's job description was not changed and her pay remained the same.

13.     In or about January of 2011, Ms. Smith was assigned additional duties as the Federal Project Manager for a new system, OneTrack CMS.  This was another GS-14 level position, but Ms. Smith's pay and job description did not reflect the additional assignment.

14.     In fact, assigning African American females higher level assignments and responsibilities without appropriate promotion or increase in compensation is a common occurrence at GCBD.  In addition to Ms. Smith, multiple other women, including Ms. Linda Waters, Ms. Malda Brown, Ms. Kim Mace, and Ms. Sheila Thomas, were assigned higher graded duties but not appropriately compensated or granted promotions to reflect the higher level duties.

15.     After not receiving appropriate compensation or a change in her job description to reflect her GS-14 level duties, Ms. Smith contacted Mr. Darryl Hairston, Associate Administration of Business Development, in early 2013 and requested that she receive compensation commensurate with her duties.  Ms. Smith explained that she had been performing GS-14 duties for an appreciable length of time without proper recognition or compensation.

16.     In response, Mr. Watkins ordered that a desk audit be conducted to determine whether Ms. Smith was performing GS-14 duties.

17.     A desk audit was conducted in or around April 2013.  The results of the audit confirmed that Ms. Smith had, in fact, been performing GS-14 duties for more than two years.

18.     Customary Agency employment practice dictates that if a desk audit reveals an employee is performing tasks above his or her GS level, that employee should be automatically promoted to the higher grade.  However, Ms. Smith was not promoted following the desk audit.

19.     Instead, Ms. Smith was advised that the Agency would advertise a GS-14 Program Analyst position for the higher level functions she was then performing.

20.     Contrary to the representation of the Agency, the GS-14 position was never advertised.

21.     After the desk audit, Ms. Smith continued to perform the GS-14 level functions without a change to her job description, a pay increase, or an award of back pay.

22.     As a result, Ms. Smith continued to inquire with Mr. Watkins as to why she was not being appropriately compensated or promoted, despite the findings of the desk audit.  Ms. Smith also requested a copy of the desk audit.  Mr. Watkins either ignored or denied all of Ms. Smith's requests for a promotion and increase in pay, and denied her request for a copy of the results of the desk audit.

23.     In addition to being tasked with GS-14 work without appropriate compensation or promotion, Ms. Smith was also denied a promotion to another GS-14 position for which she was the most qualified candidate.

24.     In late 2012, GCBD advertised a GS-14 level IT Project Manager position (Job Announcement #13-038-BC), which closed on December 20, 2012.  The position description

covered many of the project management duties Ms. Smith was then performing.  As she was more than qualified for the position and had already been performing many of the duties encompassed by the position, Ms. Smith applied and made the qualified candidates list.

25.    However, on April 14, 2013, Ms. Smith received an email from SBA's Chief of Acquisition Division stating that "the hiring manager closed out the recruitment [for the IT Project Manager] with no selection made.  They are re-assessing their office needs to determine best approach in staffing their position(s)."

26.    However, in the ensuing months, Ms. Kimberly Russell, a Caucasian female, was hired as a GS-14 and began to participate in calls and meetings regarding GCBD's IT systems and report her findings to GCBD senior managers.  The responsibilities performed by Ms. Russell during this time mirrored those that had been advertised in the IT Program Manager posting, which had been reportedly closed without being filled.

27.    Ms. Smith was more qualified for the position than Ms. Russell.  Ms. Russell, who was coming from the private sector, had no prior Federal government employee experience. In addition, Ms. Russell had minimal experience with one of GCBD's systems.  This stands in stark contrast to Ms. Smith, who had decades of experience with the Agency, including many years managing the specific projects assigned to Ms. Russell.

28.    Likewise, in April 2013, Ms. Smith applied for GS-15 level position as the Director of Certification and Eligibility.  The position was previously held by Mr. Watkins, who was receiving a promotion.

29.    Ms. Smith had been performing many of the duties of the Director position before and after Mr. Watkins' promotion, including providing trainings on eligibility requirements, and was well qualified for the position given her extensive experience and master's certification in

contracting and acquisitions.  However, Ms. Smith did not even make the qualified candidate list and was not considered for the position.

30.     The position instead was given to Ms. Van Tran, a non-African American female who only had approximately six months' experience with the Agency and who Ms. Smith had previously trained.

31.     Immediately before Ms. Tran received the position, Mr. Watkins granted her area-specific training which assisted her in meeting the requirements of the position.  He did not offer the same training to Ms. Smith.

32.     The hiring of Ms. Russell and Ms. Tran were just two more examples of Mr. Watkins' repeated practice of refusing to promote African American Women to positions at GS-14 or above.  Indeed, none of the African American women who hold a GS-14 or higher position with GCBD were hired by Mr. Watkins; instead, they were already with GCBD before Mr. Watkins joined the unit, or were "lateralled" from other departments or agencies where they were already GS-14 or higher.

33.     At this same time, Mr. Watkins also began denying Ms. Smith's requests for training, a critical component of her ability to have upward mobility with the Agency.

34.     From mid-2012 to late 2013, Ms. Smith made approximately 13 requests for funding to attend training sessions.  Only one of the requests was granted, and it was not granted by Mr. Watkins but instead by another member of GCBD management.  In many instances, Ms. Smith received no response at all from Mr. Watkins regarding her training requests.  In some instances, Ms. Smith was forced to take personal leave and travel to the trainings at her own expense.  The expenses were never reimbursed by the Agency.

35.     Most of the trainings denied to Ms. Smith were required for her Project Manager certification.  By denying her requests for training, Mr. Watkins prevented Ms. Smith from enhancing her qualifications for GS-14 and GS-15 positions.  Ms. Smith was also pulled, with a two-day notice, from performing nationwide trainings for the Train the Trainer events, an initiative that Ms. Smith had participated in since inception.  This action resulted in a work-related stress rash that stemmed from her chest to her feet, as documented by her physician.

36.     At this time, Mr. Watkins also denied Ms. Smith access to critical meetings for the projects to which she was assigned.

37.     For example, from July through September, 2013, there were regular meetings four or five times per week regarding OneTrack CMS.  Despite Ms. Smith's position as Federal Project Manager for the program, she was not even made aware of the meetings.

38.     As a result of Mr. Watkin's actions in blocking Ms. Smith from meetings, Ms. Smith was routinely blindsided by issues or lacked critical information which had been disseminated during the meetings.

39.     On August 29, 2013, as a result of the discriminatory treatment she had been subjected to by the Agency through the acts of Mr. Watkins, Ms. Smith filed an informal complaint with the EEO Office alleging discrimination based on her race and sex.

40.     Ms. Smith's initial interview with the EEO Office was conducted on September 4, 2013, during which she notified the Agency, in great detail, of the discriminatory practices of Mr. Watkins.

41.     Thereafter, the Agency, primarily through the actions of Mr. Watkins, engaged in a continuing pattern of discrimination and retaliation against Ms. Smith for her efforts in

pursuing an EEO claim against the Agency by taking a series of steps to remove her GS-14 duties, prevent her promotion above a GS-13, and make her working conditions unbearable.

42.     On September 11, 2013, only six days after Ms. Smith had her initial interview with the EEO Office, GCBD implemented its retaliatory scheme when Calvin Jenkins, the Deputy Director of GCBD, announced that Ms. Russell would thereafter be "covering all project management" for GCBD, which were GS-14 level duties.

43.     Taken aback by the sudden announcement and concerned it meant the removal of her GS-14 level duties, Ms. Smith immediately emailed Mr. Watkins to clarify her role in light of Mr. Jenkins' announcement.  Mr. Watkins responded that Ms. Russell would serve as a "resource" for all of GCBD, but Ms. Smith would still support the systems.

44.     However, on September 24, 2013, less than one month after Ms. Smith initiated the EEO process, Mr. Watkins removed Ms. Smith from the GS-14 level role as the Federal Program Manager for OneTrack CMS, which she had led since its inception.  Ms. Smith was told that going forward, she would only provide support, and that all communications should go through Ms. Russell, which was a further diminution of her GS-14 level duties.

45.     On December 30, 2013, Ms. Smith filed a formal Complaint with the EEO Office.

46.     In continuing retaliation for Ms. Smith's EEO actions, on January 23, 2014, less than a month after she filed her formal complaint, Ms. Smith was informed by Ms. Lynn Douthett, the North Carolina District Director, that she would not receive office space at the SBA facility in North Carolina following its remodeling.

47.     While Ms. Douthett had previously promised Ms. Smith an office in light of her grade and tenure, after Ms. Smith filed her complaint, she was informed that there would be no space available for her.

48.     Instead, Ms. Smith was forced to break down her computer and phone, put it on a storage shelf, and go home.

49.     As a direct result of the discriminatory and retaliatory treatment, Ms. Smith began three months of medical leave on January 27, 2014 at the direction of her physician.  As documented by her physician, Ms. Smith suffered acute stress, elevated blood pressure, elevated heart rate, and anxiety, caused by the work environment to which she was subjected.

50.     On or about February 11, 2014, Ms. Smith submitted a letter from her physician to the EEO Office and the Agency's attorney, Mr. Larry Webb, stating that Ms. Smith was under medical care and that she was suffering from adverse health concerns as a result of her work environment.  In the letter, the physician recommended that Ms. Smith be transferred to a different department.

51.     By April, the Agency had not yet responded to the transfer request from Ms. Smith's physician.  Therefore, on or about April 7, 2014, Ms. Smith sent the EEO Office another letter from her physician again requesting that she be transferred to a different department or office, in order to remove her from the detrimental impact of the repeated discriminatory and retaliatory practices of Mr. Watkins.   The letter specifically stated that Ms. Smith was on medication to treat blood pressure and heart rate elevation as a result of stress from her working environment.

52.     On May 5, 2014, after having still not received any response whatsoever to her accommodation request to be transferred to a different division or office, Ms. Smith again contacted the EEO Office inquiring as to the status of her request.

53.     On May 9, 2014, she finally received a letter from the EEO Office regarding her medical accommodation request.  However, the letter stated "[i]t is not clear if you are

requesting a reasonable accommodation," despite the fact that the physician's prior letters clearly stated the specific accommodation being requested.

54.     Ms. Smith's physician responded to May 9 letter on or about May 16, 2014, repeating the accommodation request and explaining in further detail the nature of Ms. Smith's medical issues and the direct correlation of her medical issues to her working environment.  The physician again requested that Ms. Smith to be transferred to a different department.

55.     When the Agency did not respond to Ms. Smith's request within 21 days, per the Agency's standard operating procedures, Ms. Smith reported these further acts of retaliation by contacting the EEO Office to report that the deadline for a response had not been met.

56.     The very next day, July 2, 2014, Ms. Smith received an email from Ms. Tran indicating that her request for accommodation was denied and she would not be transferred, yet another act of retaliation.

57.     A transfer, as requested by Ms. Smith and her physician, could have been easily accomplished.  Ms. Smith's customers were nationwide and she supported all Business Opportunity Specialists in the District Offices across the country.  Ms. Smith could have performed her duties from the Office of Field Operations, or any other office.

58.     In further retaliation for pursuing her claim with the EEO Office, in early April 2014, while she was still on leave for her disability, Ms. Smith received an email, to her personal email address, notifying her that the remaining duties which she had previously been performing which qualified her for the GS-14 position per the desk audit were being removed, that she would be reassigned to a new position description, new title, and new GS series, and that Ms. Tran would thereafter serve as her manager.  Ms. Smith received this email within one week of

receiving notice from the EEO office that her formal complaint of discrimination had been accepted for investigation.

59.     In addition, after Ms. Smith returned from medical leave, she was again subjected to retaliation when she was not given proper office space, but instead was assigned to a small space at the office's Answer desk, which is the size of approximately one-half of a regular sized cubicle.  The desk is nestled among many call center employees who are constantly taking phone calls, thereby distracting Ms. Smith and impeding her ability to efficiently perform her duties.

**COUNT I**
**Discrimination in Violation of Title VII**

60.     Ms. Smith re-alleges and incorporates by reference Paragraphs 1 through 60 as if set forth fully herein.

61.     The Agency, with the intent of discriminating against Ms. Smith, engaged in a pattern of discriminatory behavior based her sex (female) and race (black) that affected the terms and conditions of Ms. Smith's employment by materially altering her work environment and/or by committing a series of adverse actions.

62.     The Agency engaged in the following discriminatory actions against Ms. Smith:

a.   Assigning Ms. Smith GS-14 level duties without a corresponding promotion, pay increase, or award of back pay, even after a desk audit revealed that the tasks Ms. Smith performed constituted GS-14 level work;

b.   Refusing to promote Ms. Smith to GS-14 and GS-15 level positions to which she applied and for which she was the most qualified candidate, and instead hiring or promoting only non-African American females to such positions;

    c.   Denying Ms. Smith training opportunities which were necessary for career advancement and which were made available to other non-black, non-female employees;

    d.   Blocking Ms. Smith from critical meetings regarding projects to which she was assigned, thereby inhibiting her ability to perform her duties;

    e.   Refusing to provide Ms. Smith with office space at the North Carolina office, or otherwise provide her with reasonable working conditions;

    f.   Denying Ms. Smith reasonable accommodation in the form of a transfer to a different division; and

    g.   Removing Ms. Smith's GS-14 level duties, reassigning Ms. Smith to a new position, position, series, and title, and assigning Ms. Smith to report to Ms. Tran rather than granting her a promotion to a GS-14 level position.

63.    Ms. Smith's race and sex together were a motivating factor for each of the foregoing acts.

64.    The foregoing acts violated Title VII, 42 U.S.C. §§2000e *et seq.* and therefore entitles Ms. Smith to relief.

65.    As a direct and proximate result of the Agency's discriminatory conduct, Ms. Smith has suffered and continues to suffer injury and damage in the form of anxiety, high blood pressure, acute stress, constant fear of job loss, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, fear and concern for her future ability to earn a living, past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, medical expenses, mental anguish and emotional distress.

66.    Due to the conscious disregard for Ms. Smith's federally protected rights, and the severity of the Agency's conduct, Ms. Smith is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Smith prays on her behalf that this Court grant her judgment in her favor against the Agency, and further:

A.   Award compensatory damages, consisting of back pay, front pay, economic loss, humiliation, embarrassment, mental anguish and emotional distress caused by the Agency's acts in an amount not less than $600,000;

B.   Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

C.   Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

D.   Award equitable relief, including but not limited to promotion to a GS-14 level position or higher, appropriate training, and reassignment; and

E.   Order such other relief as this Court deems just and equitable.

## COUNT II
### Retaliation in Violation of Title VII

67.    Ms. Smith re-alleges and incorporates by reference Paragraphs 1 through 60 as if set forth fully herein.

68.    Based on Ms. Smith expressing her disapproval of, and challenging, Mr. Watkins' discriminatory treatment of her and filing and pursuing the EEO complaint initiated on August 29, 2013 and formally filed on December 30, 2013, the Agency knowingly and intentionally engaged in acts of discrimination and retaliation against Ms. Smith by:

a.  Assigning Ms. Smith GS-14 level duties without a corresponding promotion, pay increase, or award of back pay, even after a desk audit revealed that the tasks Ms. Smith performed constituted GS-14 level work;

b.  Refusing to promote Ms. Smith to GS-14 and GS-15 level positions to which she applied and for which she was the most qualified candidate, and instead hiring or promoting only non-African American females to such positions;

c.  Denying Ms. Smith training opportunities which were necessary for career advancement and which were made available to other non-black, non-female employees;

d.  Blocking Ms. Smith from critical meetings regarding projects to which she was assigned, thereby inhibiting her ability to perform her duties;

e.  Refusing to provide Ms. Smith with office space at the North Carolina office, or otherwise provide her with reasonable working conditions;;

f.  Denying Ms. Smith reasonable accommodation in the form of a transfer to a different division; and

g.  Removing Ms. Smith's GS-14 level duties, reassigning Ms. Smith to a new position, series, and title, and assigning Ms. Smith to report to Ms. Tran rather than granting her a promotion to a GS-14 level position.

69.  The foregoing acts violated Title VII, 42 U.S.C. §§2000e *et seq*. and therefore entitles Ms. Smith to relief.

70.  As a direct and proximate result of the Agency's retaliatory conduct, Ms. Smith has suffered and continues to suffer injury and damage in the form of anxiety, high blood pressure, acute stress, constant fear of job loss, diminished self-confidence and self-worth,

feelings of helplessness and hopelessness, fear and concern for her future ability to earn a living, past and future loss of income and benefits of employment, lost career and business opportunities and advancements, damage to reputation, humiliation, embarrassment, medical expenses, mental anguish and emotional distress.

71.     Due to the conscious disregard for Ms. Smith's federally protected rights, and the severity of the Agency's conduct, Ms. Smith is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Smith prays on her behalf that this Court grant her judgment in her favor against the Agency, and further:

A.  Award compensatory damages, consisting of back pay, front pay, economic loss, humiliation, embarrassment, mental anguish and emotional distress caused by the Agency's acts in an amount not less than $600,000;

B.  Award punitive and exemplary damages, to be determined by a jury, and in any event no less than $300,000;

C.  Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

D.  Award equitable relief, including but not limited to promotion to a GS-14 level position or higher, appropriate training, and reassignment; and

E.  Order such other relief as this Court deems just and equitable.

Respectfully submitted,

Nicholas Hantzes (D.C. Bar # 361450)
HANTZES & ASSOCIATES
1749 Old Meadow Road, Suite 308
McLean, Virginia 22102
Tel: (703) 378-5000
Fax: (703) 448-4436
nhantzes@hantzeslaw.com
*Counsel for Plaintiff*

## DEMAND FOR JURY

Plaintiff hereby demands a jury on all issues to which she is entitled to a jury.

Nicholas Hantzes (D.C. Bar # 361450)
HANTZES & ASSOCIATES
1749 Old Meadow Road, Suite 308
McLean, Virginia 22102
Tel: (703) 378-5000
Fax: (703) 448-4436
nhantzes@hantzeslaw.com
*Counsel for Plaintiff*