## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CASANDRA SMITH**, | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-472 (CRC) |
| **LINDA MCMAHON**,[1] **Administrator, Small Business Administration**, | |
| Defendant. | |

### MEMORANDUM OPINION

Plaintiff CaSandra Smith was a longtime employee of the U.S. Small Business Administration ("SBA") when in May 2013 she learned through a desk audit that she was, literally, working above her paygrade. In response, Smith's supervisor—relying on advice from an SBA job classification specialist—sought to create a new position for her. However, due to a mix-up in the SBA's Human Resources office and a subsequent hiring freeze, the position was never posted, and the SBA solved the problem instead by relieving Smith of her above-grade duties. Believing that her non-promotion was the product of discrimination on the basis of her gender and race (African-American), Smith filed a complaint with the agency's Equal Employment Opportunity ("EEO") office. Subsequently, the SBA took a number of actions— including the denial of Smith's requests for a transfer and a private office—that Smith viewed as attempts to retaliate against her for the EEO activity. She brought suit in this Court, challenging the non-promotion, the alleged retaliatory actions, and other non-selections.

---

[1] By operation of Fed. R. Civ. P. 25(d), the current Administrator of the Small Business Administration, as former Administrator Contreras-Sweet's successor, has been "automatically substituted as a party."

1

While acknowledging the complexity of the facts underlying this case, the Court ultimately concludes that Smith has failed to produce sufficient evidence permitting a reasonable jury to find that any of the adverse actions she alleges were motivated by discrimination or retaliation.  See McGrath v. Clinton, 666 F.3d 1377, 1383 (D.C. Cir. 2012); Calhoun v. Johnson, 632 F.3d 1259, 1261 (D.C. Cir. 2011).  The Court will therefore grant summary judgment for the SBA.

## I.   Background

Smith has been an employee of the SBA since 1989.  See Def.'s Mem. Supp. Mot. Summ. J. ("MSJ"), Ex. 1 at 11:20–21.  She began her tenure with the agency at its headquarters in Washington, D.C., but after several years, she relocated to the SBA's North Carolina District Office in Charlotte.  See id. at 12:16–25.  Between 1994 and 2009, Smith's positions varied significantly, and they included some supervisory roles.  See id. at 12:16–13:16; 157:23–158:14. In 2009, though still posted in Charlotte, Smith took a position as a Program Analyst with the SBA's Washington-based Office of Certification and Eligibility.  See id. at 13:22–24, 14:13–15; Def.'s MSJ, Ex. 3.  That Office is located within the Office of Business Development, which in turn is a subdivision of the Office of Government Contracting and Business Development ("GCBD").  See Def.'s MSJ, Ex. 4.

### A.  Desk Audit, Promotion Efforts, and Reassignment of Duties

Although Smith's Program Analyst job was a GS-13 position, she was soon assigned IT project management responsibilities that former GS-14 employees had performed.  Pl.'s Mem. Opp'n Def.'s MSJ ("Pl.'s Opp'n), Ex. 18 at 254–59.  By early 2013, Smith was convinced that she was doing above-grade work, and she voiced that concern to management.  Compl. ¶ 15.  In response, Robert Watkins—Smith's supervisor for nearly all of the time period relevant here,

Def.'s MSJ, Ex. 1 at 15:21–16:2—requested that the Human Resources office conduct a "desk audit," Def.'s MSJ, Ex. 26, which is "a formal review of [an employee's] duties and responsibilities . . . [to] [d]etermine[] what knowledge, skills, and abilities are necessary to perform[ing] [the] job," Def.'s MSJ, Ex. 25 at 16.  Kia Wyche, in Human Resources, began the desk audit in April 2013.  Def.'s MSJ, Ex. 1 at 73:1–5, 76:10–12.  The next month, Wyche emailed Watkins to convey that she had completed the desk audit, and that the "correct classification for [Smith's] position" was at a GS-14 level.  Def.'s MSJ, Ex. 27.  But Wyche went on to note that Smith's performance of GS-14-level duties was considered the result of "a planned management action, since GS-14 duties [had been] assigned to a GS-13 employee," rather than simply being acquired due to increased need over time.  Id.  As a result, under agency human resources policy, any grade promotion for Smith could not be automatic, since "competition would apply to filling [the newly recognized GS-14] position."  Id.

Heeding Wyche's advice, Watkins assembled the paperwork necessary to initiate a personnel action for the GS-14 position, and on May 20—less than two weeks after the completion of the desk audit—a recruitment action request was submitted to Human Resources for processing.  See Def.'s MSJ, Ex. 29.  Nearly four months later, Human Resources emailed to apologize:  There had been a mix-up involving two separate recruitment actions, which had caused a processing delay.  Def.'s MSJ, Ex. 30.  Roughly a week later, Watkins and his supervisor, Darryl Hairston, completed a *second* personnel action request, this time clarifying that the position was open only to GCBD employees (including Smith) and was subject to an alternative work site (like Smith's).  Def.'s MSJ, Ex. 31.  That was emailed to Human Resources the same day.  Id.

Mild dysfunction in the SBA's Human Resources department preceded major dysfunction, at the federal government writ large.  Only a few days after the Human Resources snafu had been resolved, from October 1 through October 16, 2013, all federal government agencies—including the SBA—underwent a budget-related shutdown.  Soon after the shutdown, in light of continuing budgetary uncertainty, the SBA implemented an agency-wide hiring freeze, which lasted through early 2014.  See Def.'s MSJ, Ex. 17 at 62:13–18, 114:11–115:5.  During that period, all final hiring decisions were made by the Administrator, see id. at 58:19–59:5; Def.'s MSJ, Ex. 11 at ¶ 37, and to facilitate that process, in November 2013, SBA senior administrators and office heads were instructed to submit priority hiring lists for their respective divisions.  See Def.'s MSJ, Ex. 35.  On November 25, GCBD submitted its list, which included the GS-14 post intended for Smith.  Id.  In January 2014, the SBA's Acting Administrator released an agency-wide priority hiring memorandum, approving hiring at GCBD for ten positions, but only for the purpose of "complet[ing] the transition to HQ of the centralized 8(a) portfolio review."  Def.'s MSJ, Ex. 37.  The GS-14 position intended for Smith did not fall within that category, and accordingly, it was cancelled.  See id. (email from SBA Chief Human Capital Officer to GCBD leadership seeking "[a]pproval to cancel any . . . job announcement" not relating to the portfolio review transition and "[a]pproval to cancel your one internal hire"); see also Def.'s MSJ, Ex. 6 at 88:7–11.

No longer able to raise Smith's position grade, Watkins set about reducing her responsibilities (again, on the advice of Human Resources).  See Def.'s MSJ, Exs. 38–39.  According to agency protocol, this approach—removing above-grade duties—is one acceptable means of responding to a desk audit that reveals a mismatch between an employee's current grade and current responsibilities.  See Def.'s MSJ, Ex. 25 at 16; Ex. 17 at 96:6–14.  Throughout

January and February 2014, Watkins worked with Human Resources to draft a new position

description for Smith.  See Def.'s MSJ, Exs. 38–39.  In March 2014, Watkins notified Smith

that, effective the following month, she would be reassigned from the GS-13 "Program Analyst"

position to the GS-13 "Business Systems Support Specialist" position.  Def.'s Ex. 40.  The notice

also made clear that Smith's grade and salary would not be affected.  Id.  Because Smith was on

medical leave when this first notice of reassignment was sent, the notice was reissued in May.

See Def.'s MSJ, Exs. 41, 43.

     B.  Non-Selections for Two Positions

     Smith complains not only of the SBA's failure to create a new GS-14 position for her, but

also of her non-selection for two *existing* positions.[2]  First, in April 2013, at the same time the

SBA was conducting the desk audit for her position, Smith applied for the GS-15 position of

Director of Certification and Eligibility.  Def.'s MSJ, Ex. 1 at 51:10–23.  As specified in the job

posting, applicants for the position were evaluated along two tracks—"Merit Promotion" and

"Delegated Examining"—each with its own set of hiring criteria.  See Def.'s MSJ, Ex. 21.

Smith submitted her application *only* through the latter, "Delegated Examining" track, under

which military veterans are given preference.  Def.'s MSJ, Ex. 11 at ¶ 20.  Because Smith did not

identify herself as a veteran in her application, Human Resources did not include her on the

certified list of eligible "Delegated Examining" candidates.  Id. at ¶ 30.  Smith was not listed

among eligible "Merit Promotion" candidates, either, because she did not submit her application

under that category.  Id. at ¶ 31.  In contrast, the candidate selected for the position—Ms. Van

---

[2] Smith complained of other non-selections as well, but she has not responded to SBA's
arguments as to three of these claims, and so has effectively conceded them.  See Def.'s MSJ 21–
23, 23–24, 29–30; Def.'s Reply Supp. MSJ ("Def.'s Reply") 2.

Tran—applied under *both* application tracks, and was ultimately chosen from a list of "Merit Promotion" qualified individuals. Id. at ¶ 32.

   Smith also challenges her non-selection for a Business Opportunity Specialist position in the SBA's Los Angeles District Office. Even though the position had been previously classified as GS-13, a December 2014 vacancy announcement elevated the post to GS-14. See Def.'s MSJ, Ex. 74 at 17:17–20, 23:13–19.[3] Smith applied for that position. Id. at 16:9–15. However, soon after the vacancy announcement was published, the Office of Field Operations in the SBA's headquarters cancelled the position, indicating that it would not be hiring any business opportunity specialists at the GS-14 level. See id. at 36:20–22, 37:18–38:16. The position was eventually re-advertised, but at the GS-13 level, and Smith opted not to apply for it. See Def.'s MSJ, Ex. 1 at 167:10–12.

   C.   Smith's EEO Activity and the SBA's Alleged Retaliation

   On August 29, 2013—after the completion of the desk audit, and during the SBA's protracted attempts to create a GS-14 position for her—Smith contacted the agency's EEO Office, complaining of race- and sex-based discrimination. Compl. ¶ 39. The Office interviewed her about a week later, id. at ¶ 40, and Smith participated in an unsuccessful mediation on December 20, 2013, see Pl.'s Opp'n, Ex. 4 at 15, 18. Smith subsequently submitted a formal EEO complaint—dated December 30, and received January 2, 2014. Def.'s MSJ, Ex. 68 (Formal EEO Complaint); Ex. 69 (Acknowledgment of Receipt). Smith argues that,

---

   [3] Smith contends that the Los Angeles District Director, Victor Parker, raised the position's grade specifically to entice her to apply for the position, but he was apparently unaware that she had applied until after the GS-14 position was cancelled. See Def.'s MSJ, Ex. 74 at 35:5–11.

beginning with her first EEO contact in August 2013 and after, the SBA engaged in a series of

acts aimed at retaliating against her for engaging in that protected activity.

> 1.  *Office Space*

As discussed above, during the period relevant here, Smith was based in the SBA's

Charlotte District Office.  Until 2013, although Smith was permitted to telework nine of every

ten days, see Def.'s MSJ, Ex. 54, she was assigned a cubicle in the "Answer Desk" section of the

office, which functioned as a national call center.  Def.'s MSJ, Ex. 1 at 190:2–5.  In fall 2013,

Smith had a conversation with Lynn Douthett, the North Carolina District Director, about an

upcoming renovation of the office.  According to Smith, Douthett offered to assign her a private

office, and "even showed [her] two potential" office locations.  Def.'s MSJ, Ex. 1 at 186:5–13.

Douthett recalls, instead, that she only offered to "see what [she] could do" about obtaining

office space for Smith, and further clarified that "there were no guarantees," since the office

would be "downsizing from 11,000 square feet to around 5,000."  Def.'s MSJ, Ex. 44 at 50:12–

15.

Regardless, the renovations took place from January to April 2014, and during that time,

there was considerable confusion—involving roughly a half-dozen upper-level managers—

regarding where Smith's desk would ultimately be located.  See Def.'s Statement of Facts

("SOF") at ¶¶ 209–27.  In the end, due to the significant reduction in the office's size, Smith was

assigned a cubicle in the same "Answer Desk" section where she had previously been located,

though—like all other cubicles in the office—it was smaller after the renovation.  See Def.'s

MSJ, Ex. 1 at 196:22–24; Ex. 17 at 108:6–8.  Only one employee in the "Answer Desk" area had

a stand-alone office after the renovation:  She had occupied a private office before the renovation

and, unlike Smith, was a supervisor.  Id. at 109:14–22, 123:7–18.

### 2. *Training Requests*

Smith submitted three requests for training that were denied—at least initially—following her contact with the EEO office.[4]  First, in fall 2013, Smith sought to attend two project management training sessions in Washington, D.C.  Watkins initially denied that request due to lack of funding, and also initially advised Smith that she could not travel to D.C. on her own dime, since that would require reimbursement from the SBA.  See Def.'s MSJ, Ex. 78.  However, after Smith spoke to agency counsel and explained that she had an independent reason for traveling to D.C., she was permitted to attend the training.  See id.; Def.'s MSJ, Ex. 75 at 6–7.  Smith also complains that Watkins was nonresponsive to two 2014 training requests—one submitted in January for a free online seminar, and one submitted in April for a project manager re-certification course.  Id. at 7–8.  A different manager ultimately approved both of those trainings, however.  Id.

### 3. *Reasonable-Accommodation Request*

In May 2014, Smith submitted a reasonable-accommodation request to the SBA's EEO Office, seeking a 100-percent telework schedule (an increase from her 90-percent telework arrangement) and a transfer to another SBA department.  See Def.'s MSJ, Ex. 55.  After some back and forth, including a request for additional medical documentation, the SBA granted Smith's telework request in October 2014.  See Def.'s MSJ, Ex. 58.  However, in July 2014, Tran—Smith's supervisor at the time—denied her request for a transfer, citing agency policy that a reassignment is a reasonable accommodation of "last resort," to be used only "when an employee is unable to perform the essential functions of [her] position."  Def.'s MSJ, Ex. 56.  In

---

[4] Smith also claims to have submitted numerous requests which were denied prior to her first EEO contact, see Def.'s MSJ, Ex. 75 at 6–8, but for obvious reasons those denials could not have been retaliatory.

September 2014, Tran's decision was reviewed and affirmed by the SBA's Reasonable Accommodation Review Committee.  Def.'s MSJ, Ex. 57.  Finally, in January 2015, the Federal Occupational Health Service also weighed in:  After a thorough review of Smith's medical documentation, it agreed that Smith had not justified a reasonable-accommodation request, because she had not shown an inability to perform essential functions of her position.  Def.'s MSJ, Ex. 61.  The Chair of the SBA's Reasonable Accommodation Review Committee communicated those results to Smith in a February letter, explaining that "[t]he provided documentation [did] not establish that [she was] suffering from a substantial impairment, only that she believe[d] she [was] being treated unfairly by her managers."  Def.'s MSJ, Ex. 62.  Accordingly, the agency denied the transfer request.  Id.

    *4.  Train-the-Trainer Events*

The SBA operates "Train-the-Trainer" sessions, where SBA employees visit district offices throughout the country and train participants, who in turn train other employees within their local office.  See Pl.'s Opp'n, Ex. 19 at 35:17–38:8.  Smith had been a trainer at these events, and in June 2014, she was slated to participate again, albeit via webinar.  See Def.'s MSJ, Ex. 81.[5]  However, soon before the event, Smith was notified via email that there would be no call-in at the event, and that she would no longer be presenting.  Def.'s MSJ, Ex. 82.  It is unclear whether the email sender—another SBA employee—or Watkins made the decision to cancel the call-in.  See Pl.'s Opp'n, Ex. 18 at 227:9–228:25.  The record also reveals alternate explanations for the decision.  Watkins suggested Smith's expertise was unnecessary for the training.  Pl.'s

_____

[5] The other trainers scheduled to attend the June 2014 sessions presented in person, and it is unclear why it was arranged for Smith to present virtually.  However, one likely explanation is that Smith was the only SBA employee slated to present at *three* sessions, each of which was located in a different U.S. city and none of which was in Charlotte.  See Def.'s MSJ, Ex. 81.

Opp'n, Ex. 25 at 8:9–21.  Tran was under the impression that Smith did not participate "due to [the] lack of proper technology."  Def.'s MSJ, Ex. 83 at ¶ 5.

D.  <u>Procedural History</u>

Smith filed a complaint in this Court in April 2015, alleging that the SBA had engaged in discrimination based on her sex and race, and had retaliated against her for seeking redress from the EEO.  A period of discovery followed, and the SBA now moves for summary judgment, contending that there can be no genuine dispute that, in acting as it did, the agency was motivated by legitimate, nondiscriminatory considerations.  For instance, it maintains that Smith's supervisors did what they could to promote her after the desk audit, but that their efforts were frustrated by mix-ups at Human Resources, followed by a budget crisis.  <u>See</u> Def.'s MSJ 15–21.  Likewise, the agency explains that the actions Smith views as "retaliatory" were, in some cases, not materially adverse, and in others, not demonstrably linked in any way to Smith's EEO activity.  <u>Id.</u> at 32–44.  Smith opposes the agency's motion.  She argues that the processing mishaps and budget-related hiring issues constitute an "amazing" and "incredible" constellation of circumstances, less plausible than her own account—i.e., that she was repeatedly denied promotions because she was a woman and African-American.  Pl.'s Opp'n 3–4, 11–28.  And Smith urges the Court to view the retaliatory acts she alleges in their "entirety"; under that analysis, she argues, they are cognizably adverse.  <u>Id.</u> at 4, 34–44.

The Court ultimately agrees with the SBA:  Although the agency's personnel process was hardly a model of transparency or efficiency, there is insufficient direct or circumstantial evidence in this record permitting a reasonable juror to infer that Scott was denied promotions due to her sex or race.  Furthermore, the retaliatory acts Smith alleges are not similar enough to

be grouped together, nor is there sufficient evidence that those acts were motivated by a retaliatory purpose.

## II.  Legal Standards

A court will grant summary judgment if the movant "shows that there is no genuine dispute as to any material fact," such that "judgment as a matter of law" is proper.  Fed. R. Civ. P. 56(a).  A material fact is one that could affect a suit's outcome under the relevant law, and a genuine dispute is one that a reasonable juror could resolve in favor of the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[A] party seeking summary judgment . . . bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  But "after adequate time for discovery and upon motion," a court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

## III.  Analysis

As outlined above, Smith brings claims that her non-promotion and two non-selections were discriminatory, and also that several of the agency's actions following her EEO activity were retaliatory.  The Court will discuss each set of claims in turn.

### A.  Non-Promotion and Non-Selection Claims

Because the SBA has "assert[ed] a legitimate, non-discriminatory reason" for the non-promotion and non-selections that Smith challenges, "the question whether [Smith] actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the

picture.'"  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting St.

Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510, 511 (1993); Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 143 (2000)).  Accordingly, the Court "need not—and should not—

decide whether [Smith] actually made out a prima facie case under McDonnell Douglas."  Brady,

520 F.3d at 494.  Rather, that "framework falls away[,] and the court must decide one ultimate

question: 'Has the employee produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory reason [for the termination] was not the actual reason[,]

and that the employer intentionally discriminated against the employee[?]'"  DeJesus v. WP Co.

LLC, 841 F.3d 527, 532–33 (D.C. Cir. 2016) (quoting Brady, 520 F.3d at 494).  That "ultimate

question" is really two: the first addressing whether the proffered reason is pretextual or genuine,

and the second evaluating whether the actual reason was discrimination.

### 1.  Non-Promotion to Position at GS-14 Level

The lion's share of Smith's complaint and Opposition brief is devoted to the argument

that the agency's failure to create a GS-14 position for her following the desk audit—and to hire

her for that position—was discriminatory.  As Smith frames it, that non-promotion was actually

the result of three separate agency actions:  the decision not to automatically promote Smith

following the desk audit; the delay in posting the GS-14 position intended for her; and the

ultimate cancellation of the position.

### a.  No Automatic Promotion

As recounted above, see supra section I.A, when Wyche in Human Resources completed

Smith's desk audit and confirmed via email that Smith had been performing above-grade duties,

she also noted that the GS-14-level work had resulted from "a planned management action, since

GS-14 duties were assigned to a GS-13 employee."  Def.'s MSJ, Ex. 27.  For that reason, Wyche

explained that "competition would apply to filling [the newly recognized GS-14] position."  Id.
Watkins sought clarification of that determination the same day:  "How did we determine that
this was a planned management action?" he asked.  Def.'s MSJ, Ex. 28.  Wyche responded:
"Whenever management assigns duties from one position to another, it is considered a planned
management action [subject to competition]."  Id.  On the basis of this advice, rather than simply
promoting Smith on the spot, Watkins went about completing and submitting the paperwork
necessary for creating a new GS-14 position—intended for Smith, but open to others.  See Def.'s
MSJ, Ex. 29.

According to Smith, Watkins' decision to create a competitive GS-14 position rather than
automatically promote her was discriminatory.  In support of that view, she points to an agency
policy stating that, following a desk audit revealing above-grade responsibilities, the human
resources classifier "will upgrade" the position.  Def.'s MSJ, Ex. 25 at 16 ¶ 5.  She also cites
deposition testimony from two senior SBA officials, to the effect that the competition
requirement following the desk audit was "a new HR rule."  Pl.'s Opp'n, Ex. 20 at 15:17–16:12;
see also Pl.'s Opp'n, Ex. 23 at 39:10–18.

There are two fundamental reasons why this evidence could not ground a reasonable
juror's conclusion that Watkins' decision not to promote Smith automatically was motivated by
discrimination.  First, as the SBA discusses at length in its Reply, it is reasonably clear that in
advising Watkins to subject the new GS-14 position to competition, Wyche was correctly
applying a long-recognized distinction between above-grade duties resulting from "accretion,"
on the one hand, and "planned management actions," on the other.  See Skrobot v. United States,
534 F.2d 237, 242–43 (Ct. Cl. 1975) (explaining that, under the Federal Personnel Manual, an
employee may be promoted non-competitively when "the newly created position [is] the result of

[an] 'accretion of additional duties,'" rather than a "planned management action").  As Wyche

explained, because a manager *assigned* Smith above-grade duties formerly belonging to other

GS-14 employees, those duties resulted from a "planned management action," subject to

competitive promotion.  See Def.'s MSJ, Ex. 28; Def.'s Reply, Ex. 84.  On the other hand, if the

desk audit had revealed that Smith's above-grade duties resulted from "accretion" (as opposed to

reassignment), then it appears she could have been promoted non-competitively.  This at least

helps to explain both the SBA's policy that desk audits can warrant grade increases, see Def.'s

MSJ, Ex. 25 at 16 ¶ 5, as well as the impression of senior management officials that promotions

happened as a matter of course following desk audits, see Pl.'s Opp'n, Ex. 20 at 15:17–16:12;

Ex. 23 at 39:10–18.

    Even more to the point, assuming *arguendo* Smith has shown a genuine dispute as to

whether Wyche correctly applied agency policy in advising Watkins against an automatic

promotion, there is no evidence suggesting Watkins was motivated by discrimination in *relying*

upon that advice.  Watkins was clearly instructed by Wyche—a Human Resources *specialist* in

classification—that competition should apply to any potential promotion for Smith.  Even then,

Watkins did not simply take Wyche's word for it:  He sent a follow-up email asking how she

"determine[d] that this was a planned management action," and Wyche responded with an

explanation.  Def.'s MSJ, Ex. 28.[6]  Surely, Watkins' decision at that point was "justified by a

reasonable belief in the validity of the reason given," regardless of that rationale's ultimate

accuracy.  George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005).  On this basis alone, it is clear

---

[6] Smith's assertions to the effect that Watkins "immediately accepted [Wyche's] unsupported and unexplained statement," Pl.'s Opp'n 14, and that he proceeded to create a competitive position "without further inquiry or discourse," id. at 16, are at odds with the record.

that Smith has not produced sufficient evidence that Watkins' decision not to promote her automatically was discriminatory.

>    b.   Delay in Position Posting

The SBA's processing of the GS-14 recruitment action intended for Smith was, as described above, hardly a model of efficiency.  See supra section I.A.  Although the GS-14 hiring request form was completed by Watkins and submitted only about ten days after the completion of the desk audit, it appears that Human Resources failed to take any action on the matter until nearly four months later—on September 19, 2013—when it emailed to apologize for a mix-up.  See Def.'s MSJ, Ex. 30.  Watkins completed and submitted another hiring request within a week, but then—starting October 1, 2013—the SBA was subject to a federal government shutdown, and then a hiring freeze, which lasted through early 2014.  See Def.'s MSJ, Ex. 17 at 62:13–18, 114:11–115:5.  This, combined with the Human Resources mix-up, caused the delay, and ultimately the cancellation, of the GS-14 position intended for Smith.

Under Smith's reading of these events, however, the protracted processing period was intentional rather than unfortunate:  She argues that the delay in posting her position was actually part of a deliberate scheme to deny her a promotion.  In support, Smith highlights the extent of the delay (which presumably goes to pretext) by pointing to agency guidance advising that the time between the submission of a personnel action request and the posting of the requested position should be no longer than eight calendar days.  See Pl.'s Opp'n, Ex. 6.  She further posits that the delay was aimed not only at denying her a promotion, but also at facilitating the transfer of her substantive duties to another SBA employee, Kimberly Russell.  See Pl.'s Opp'n 18–21.

These arguments do not hold water.  The fundamental flaw underlying them is that Watkins is the only agency official Smith alleges to have acted with a discriminatory motive in

denying her a promotion.  Accordingly, if Watkins had been to blame for the extended delay in processing the hiring request—which the parties concede was substantially longer than what policy or practice prescribed—then Smith might have a case for pretext.  The record reflects quite the opposite, though:  Watkins completed the initial hiring request *five days* after the desk audit's completion, and saw to its submission to Human Resources another *five days* after that. See Def.'s MSJ, Exs. 29, 31.  Similarly, in September, roughly one week after Human Resources emailed about the mix-up, Watkins completed and oversaw the submission of a second, follow-up request form.  Def.'s MSJ, Ex. 31.  Smith faults Watkins for submitting this second request in "surprisingly sparse" form, Pl.'s Opp'n 16–17, but there is no evidence suggesting that the form was considered incomplete by Human Resources, and it appears from the record that the second form was submitted as a supplement to the first.  See Def.'s MSJ, Ex. 31.  In other words, the record illustrates that Watkins—the alleged discriminatory agent—far from being to blame for the delay, was actually making timely efforts to press the hiring request.

This defuses Smith's main arguments regarding pretext.  First, it is largely irrelevant that the delay violated agency guidance.  The parties agree that the delay was substantial, and well out of step with agency policy and practice.  The material point is that no record evidence suggests that Watkins caused that delay.[7]  And Smith's attempts to frame the delay as a calculated means of reassigning her duties to Russell, another SBA employee, fail for the same reason:  Watkins was not responsible for that, either.  See Def.'s MSJ, Ex. 5 at 77:14–17 (explaining that Watkins could not have assigned duties to Russell because he was not her supervisor); Pl.'s Statement of Disputed Facts ("SOF") at ¶ 5 (undisputed that Watkins was

---

[7] The Court therefore need not address the SBA's arguments that the agency policy is only discretionary, and that the guidance should not be considered because it was not previously identified during discovery.  See Def.'s Reply 13–14.

never Russell's supervisor).  Smith's theory of pretext, in short, is that Watkins, Russell's

supervisor (Calvin Jenkins), and Human Resources all conspired to delay the GS-14 posting,

thus buying time to assign away her duties.  But the record contains no evidence of such a

conspiracy.

### c.   Position Cancellation

Above, the Court discussed the events leading up to the ultimate cancellation of the GS-

14 position intended for Smith.  See supra section I.A.  Soon after the Human Resources mix-up,

from October 1 through October 16, 2013, all federal government agencies underwent a budget-

related shutdown.  The SBA then implemented an agency-wide hiring freeze, effective through

early 2014.  See Def.'s MSJ, Ex. 17 at 62:13–18, 114:11–115:5.  In November 2013, SBA senior

administrators and office heads submitted priority hiring lists.  See Def.'s MSJ, Ex. 35.  GCBD

submitted its list on November 25, which included the GS-14 post intended for Smith.  Id.  The

SBA's Acting Administrator, in January 2014, approved hiring at GCBD for ten positions, but

only for the purpose of "complet[ing] the transition to HQ of the centralized 8(a) portfolio

review."  Def.'s MSJ, Ex. 37.  While neither party explains what this "portfolio review

transition" entailed, there is no dispute that it was unrelated to the GS-14 position intended for

Smith.  The SBA proffers this as its legitimate, non-discriminatory reason for cancelling Smith's

intended position.  See Def.'s MSJ, Ex. 6 at 88:7–11.

Smith challenges that explanation in two main ways.  First, she insists that *Watkins*

actually cancelled the position before the Acting Administrator did, and that his motivations

were discriminatory and retaliatory.  See Pl.'s Opp'n 21–24.  Second, Smith asserts that every

other position on the priority hiring list was filled, including at least one that also was unrelated

to the portfolio review transition.  Id. at 26.[8]  Neither of these contentions is grounded in the record.

Smith points to two documents supposedly showing that Watkins cancelled the GS-14 position before the Administrator did.  The first is a November 2013 email from Watkins to Bridget Bean, the SBA's Chief Human Capital Officer, see Def.'s MSJ, Ex. 17 at 6:16–7:1, attaching Smith's desk audit results, listing other basic information about the desk auditor (Wyche) and the date of the audit, and noting as "background" that "[w]e had several concerns regarding moving forward with the announcement including preselection, potential EEO complaint, etc[.] that we raised[,] but we were still advised to move forward with competing the position."  Def.'s MSJ, Ex. 33B.  Smith suggests that this email indicates Watkins' desire for the GS-14 position—as of November 2013—not "to proceed to competition."  Pl.'s Opp'n 22.  But that is a clear misreading of the email:  Watkins wrote in the past tense (he "had . . . concerns" which he previously "raised" and was "advised" about), not the present.  In context, he was clearly referring to his concerns in May 2013, at the time of the desk audit, not any concerns he presently had about the posting of the position.  His deposition testimony confirms this.  See Def.'s MSJ, Ex. 88 at 46:7–50:21.

The second document Smith points to is a December 26, 2013 email from Watkins to Wyche, Smith's desk auditor.  See Def.'s MSJ, Ex. 38.  Watkins writes:  "As you may be aware[,] we weren't able to get this announcement out to get a GS-14 advertised.  We are

---

[8] Smith also complains that her position was listed "dead last" on the GCBD's hiring priority list, framing this as evidence of pretext.  Pl.'s Opp'n 27.  But the position is actually included in a separate, unranked category for internal recruits, so on the face of the document, it is unclear how the position relates in priority to the others.  See Def.'s MSJ, Ex. 35. Furthermore, as SBA points out, including the position intended for Smith on a shortlist of priority hires would be an odd way of discriminating against her in hiring.  See Def.'s Reply 17–18.

looking now at removing the work that is considered 14[-]level work from this employee and adding it to the responsibilities of a grade 14 employee that we previously hired." Id.  Surely, this email demonstrates that Watkins knew in late December that Smith's position would not be posted, and that he then began the process of removing her GS-14-level duties.  However, what no document shows is that Watkins himself made that decision.  Indeed, Smith concedes that during the hiring freeze, final hiring authority was vested in the SBA Administrator.  Pl.'s SOF at ¶ 154; see also Def.'s MSJ, Ex. 11 at ¶ 37.  And Smith has pointed to nothing in the record even suggesting that Watkins had *influence* over that decision.

Smith's other main pretext argument is that hers was "the only position on the entire priority list submitted by GCBD which was not approved."  Pl.'s Opp'n 26.  Purportedly, that follows because all positions on the list except for Smith's and another internal hire were related to the portfolio review transition.  Id.  The priority hiring document, however, appears to list numerous positions that are *not* linked to the 8(a) portfolio review transition, see Def.'s MSJ, Ex. 35, and Smith points to no evidence suggesting they *were* (or indicating whether any such positions were actually filled).  Smith also asserts that the only other internal hire on the priority list was (1) filled, despite (2) being unrelated to the portfolio review transition.  Pl.'s Opp'n 26. But Smith has pointed to no record evidence establishing either of those premises.[9]  Finally,

---

[9] The deposition testimony Smith cites in support establishes only that Jeanne Crepeau, in GCBD, *applied* for that position.  See Pl.'s Opp'n, Ex. 21 at 49:14–18.  Smith also cites deposition testimony from Calvin Jenkins, but the cited page number was not included in the exhibit.  See Pl.'s SOF at ¶ 169 (citing Jenkins Dep. [Pl.'s Ex. 23] at 78:19–80:9).  Smith's best evidence is a January 14 memo to the SBA Administrator from the Chair of the Executive Resources Board *recommending* the approval of "60 [agency-wide] internal hiring actions [then] pending" with Human Resources, under certain conditions.  Pl.'s Opp'n, Ex. 8.  But there is nothing further confirming whether Crepeau's position was among those sixty.  By the time Bean—SBA's Chief Human Capital Officer—emailed the head of GCBD on January 16 to approve only 10 positions for the portfolio review transition, she sought "approval to cancel

Smith cites to agency-wide, internal and external hiring totals (60 and 39, respectively), apparently to show that the agency hired more than the ten portfolio review positions during the freeze.  See Pl.'s SOF at ¶ 168.  Those numbers, however, in no way contradict the agency's position that the portfolio review positions were the only spots filled *within GCBD*, the subdivision where Smith was employed.  See Pl.'s Opp'n, Ex. 8 (January 2014 memorandum to the SBA Administrator recommending 60 internal and 39 external agency-wide hires, to include 10 hires within GCBD).

As explained above, Smith has failed to show that the SBA's explanations for creating a competitive GS-14 position following her desk audit; for the agency's delay in posting her position; or for its ultimate cancellation of that position were explained by pretexts, let alone pretexts for race or gender discrimination.  The Court turns now to Smith's remaining claims of discriminatory non-selection.

### 2. Non-Selection for GS-15 Director of Certification and Eligibility Position

Smith applied for the GS-15 position of Director of Certification and Eligibility in April 2013.  See supra section I.B.  Even though applicants for the position were evaluated along two tracks, "Merit Promotion" and "Delegated Examining," see Def.'s MSJ, Ex. 21, Smith submitted her application *only* through the latter, Delegated Examining track, which gives military veterans a preference.  Def.'s MSJ, Ex. 11 at ¶ 20.  Smith indicated no such preference, and accordingly, Human Resources did not certify her as an eligible Delegated Examining candidate.  Id. at ¶ 30. Of course, because she did not apply for consideration under Merit Promotion, she was excluded from that list as well.  Id. at ¶ 31.

---

[GCBD's] *one* internal hire," referring to Smith's position.  Def.'s MSJ, Ex. 37 (emphasis added).  It is unclear what happened to the other internal position.

Despite this rather straightforward—and undisputed, see Pl.'s SOF ¶ 75—account for why Smith was not selected for the position, she insists that her non-selection was discriminatory. She asserts that she was better qualified than the selectee, and argues that she should have been included in the Merit Promotion track's certification list because she had been performing GS-14-level work (thereby satisfying the relevant time-in-grade requirement). See Pl.'s Opp'n 29–32. The obvious flaw with both of these arguments is that Smith never applied to be considered under Merit Promotion. Her arguments about her relative qualifications and her eligibility for the Merit Promotion certification list are therefore beside the point.[10] And there is nothing in the record suggesting that her non-selection for the GS-15 Director position was discriminatory.

### 3. Non-Selection for GS-14 Business Opportunity Specialist Position

Smith also applied and was not selected for a GS-14 Business Opportunity Specialist position in the SBA's Los Angeles District Office. See supra section I.B. The position had been previously classified as GS-13, but in December 2014, when Smith applied, it was advertised at the GS-14 level. Def.'s MSJ, Ex. 74 at 23:13–19. Soon after the posting and the submission of Smith's application, however, the SBA's Office of Field Operations cancelled the position, explaining that it would not hire any business opportunity specialists at the GS-14 level. See id. at 36:20–22, 37:18–38:16. When the position was re-advertised at the GS-13 level, Smith did not apply for it. See Def.'s MSJ, Ex. 1 at 167:10–12.

---

[10] For a variety of reasons, as SBA explains, those arguments also lack merit. See Def.'s Reply 4 (noting that the desk audit results revealing Smith's above-grade work were released after Human Resources generated the certificate lists of eligible candidates, meaning that no deciding official could have known to give Smith time-in-grade credit).

Essentially, Smith's challenge to this non-selection boils down to chronology—i.e., the fact that the position was cancelled soon after she submitted her application.  See Pl.'s Opp'n 33 (arguing that the "amazing timing and sequence of these events points to the obvious conclusion that the position was cancelled at the GS-14 level, in yet another . . . attempt to block . . . Smith from advancing.").  The problem is that there is no evidence that anyone in the agency was even aware that she had applied for the position until *after* it was cancelled.  That includes Victor Parker, the deciding official.  See Def.'s MSJ, Ex. 74 at 35:5–11.  Nor is there any evidence connecting the cancellation of the Los Angeles position with any other incident Smith alleges, or any other official relevant to this case.  Without evidence that the cancellation was more than a simple management decision to keep a position at the grade it previously had been, Smith cannot sustain her claim.

B.  Retaliation Claims

Smith argues that, in addition to passing her over for promotions and open positions for discriminatory reasons, the SBA retaliated against her in various ways because she reached out to the EEO, in August 2013.  Pl.'s Opp'n 34.  In particular, she complains that she was denied a location transfer, private office space, and the opportunity to attend and facilitate training sessions.  Id.[11]

A prima facie retaliation case requires showing that "[an employer] took materially adverse action against [an employee] because he participated in protected activity."  Bridgeforth v. Jewell, 721 F.3d 661, 663 (D.C. Cir. 2013) (citing McGrath v. Clinton, 666 F.3d 1377, 1380

---

[11] Smith's Complaint suggests that these allegedly retaliatory actions were also *discriminatory*.  See Compl. at ¶¶ 60–66.  However, she makes no such arguments in her Opposition.  See Pl.'s Opp'n 34–44 (no mention of allegedly retaliatory actions being discriminatory).

(D.C. Cir. 2012)).  A materially adverse action, for purposes of a retaliation claim, is one that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Bridgeforth, 721 F.3d at 663 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  To show that an employer acted *because* of the protected activity, "the employee must proffer evidence from which a reasonable jury could infer the employer's retaliatory intent."  McGrath v. Clinton, 666 F.3d 1377, 1383 (D.C. Cir. 2012).  Provided that the employer has proffered a legitimate, non-retaliatory reason for the action, "the 'central question' is whether 'the employee produced sufficient evidence . . . that the employer's asserted [non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee" in violation of Title VII.  Id.  (quoting Calhoun v. Johnson, 632 F.3d 1259, 1261 (D.C. Cir. 2011)) (alterations in original).

### 1.  *Retaliatory Hostile Work Environment*

Before addressing each of the retaliatory actions Smith alleges, the Court first addresses a threshold legal issue.  Simple retaliation claims—like those alleged in Smith's complaint—rest on "discrete" and "distinct" adverse actions.  See Franklin v. Potter, 600 F. Supp. 2d 38, 76–77 (D.D.C. 2009); Lester v. Natsios, 290 F. Supp. 2d 11, 33 (D.D.C. 2003).  In Smith's Opposition brief, however, she advances a new theory of retaliation: retaliatory hostile work environment. See Pl.'s Opp'n 36.  This is a "special type of retaliation claim," with its own set of doctrinal elements.  Baird v. Gotbaum, 792 F.3d 166, 168 (D.C. Cir. 2015); see also Román v. Castro, 149 F. Supp. 3d 157, 166–67 (D.D.C. 2016) (summarizing the elements of a retaliatory hostile work environment claim).  Retaliatory hostile work environment claims permit courts to consider the "cumulative effect" of "several individual acts," which "may not be actionable on [their] own." Baird, 792 F.3d at 168 (citations omitted).  But what the claim gives with one hand, it takes a

way with the other.  Under the theory, plaintiffs must allege acts that are "adequately linked"—as evidenced by timing, nature, or type—and they must be severe or pervasive enough to "create an abusive working environment."  Id. at 168–69.

Smith's retaliatory hostile work environment claim fails to satisfy these latter two conditions.  First, the adverse actions are not thematically connected:  They did not, for example, "involve the same type of employment actions, occur relatively frequently, [or involve] the same managers."  Baird, 792 F.3d at 169 (quoting Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011)).  Rather, Smith alleges a motley mix of adverse actions, spread out over the course of nearly a year, and carried out by different managers.[12]  Second, the alleged adverse actions were not "of such severity or pervasiveness as to alter the conditions of [Smith's] employment and create an abusive working environment."  Baird, 792 F.3d at 169 (quoting Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006)).  The actions are not particularly severe or frequent, let alone threatening or humiliating.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  Smith points to the medical leave she took from January to April 2014 during the office renovation as evidence of the hardship she suffered, but the severity standard is *objective*—not subject to the heightened sensitivities of individual plaintiffs.  Besides, half of the adverse actions Smith complains of occurred *after* her return from medical leave.

---

[12] Douthett allegedly reneged on the promise of a private office between fall 2013 and early 2014.  Def.'s MSJ, Ex. 1 at 186:5–13.  Watkins denied or failed to respond to the training requests between November 2013 and April 2014.  Def.'s MSJ, Exs. 75, 78.  Stanley Jones, Jr., cancelled Smith's virtual participation in the train-the-trainer event in June 2014 (although Smith alleges this was Watkins' decision).  Def.'s MSJ, Ex. 82.  And Van Tran denied the transfer request in July 2014.  Def.'s MSJ, Ex. 56.

In short, even if Smith had properly alleged a retaliatory hostile work environment claim in her complaint—which she did not—that claim would fail on the merits, for the reasons just described.

### 2. *Discrete Retaliation Claims*

The Court now considers individually the adverse actions Smith alleges were retaliatory.

### a. Office Space

Recall that the SBA office in Charlotte underwent a renovation in early 2014; that prior to the renovation, Smith was allegedly promised a private office; but that she ended up in a cubicle in the "Answer Desk" area of the office. See supra section I.C.1. That was also her situation prior to the renovation, except that now—thanks to a significant overall downsizing of the office—her cubicle was smaller. See Def.'s MSJ, Ex. 17 at 108:6–8; Def.'s MSJ, Ex. 1 at 196:22–24. Smith's account ties her assignment to this cubicle and the denial of a private office to her EEO activity, which had begun several months prior.

The problem for Smith is that she has not identified evidence, direct or circumstantial, that would permit a reasonable jury to conclude that her cubicle assignment was the product of retaliation. See McGrath, 666 F.3d at 1383. The *only* employee in the "Answer Desk" area with a private office after the renovation, despite having a lower grade-level than Smith, was the area's *supervisor*. Def.'s MSJ, Ex. 17 at 109:14–22, 123:7–18. Such an arrangement is typical at the SBA, for the common-sense reason that managers often need to have confidential conversations with the employees they supervise. See id. at 110:10–12. At the time, Smith had no such managerial role—indeed, she was teleworking nine out of every ten days. Def.'s MSJ, Ex. 1 at 194:15–16, 210:13–15. The only other SBA employees in Charlotte with private offices

after the renovation had them prior to the renovations.  See Def.'s Reply, Ex. 90 at 28:1–10.[13]

Absent any relevant comparators—or any other evidence suggesting that the treatment Smith

received during and after the renovation was materially different from any other employee in

Charlotte—Smith's claim that her office space assignment was retaliatory cannot survive.

> b.  Training Requests

Following her EEO activity, Smith submitted three requests for training that were denied,

at least at first.  See supra section I.C.2.  Watkins initially denied the first request, for training

sessions in December 2013 and February 2014, citing a lack of funding, but Smith ultimately

attended those trainings when she explained that she would be in Washington anyway during her

leave.  See Def.'s MSJ, Ex. 75; Ex. 78 at 6–7.  Smith also alleges that Watkins failed to respond

to two 2014 training requests, but a different manager ultimately approved both of them.  See id.

at 8.

Smith's claim regarding training requests fails for at least two reasons.  First, as a result

of the denials or non-responses, she does not appear to have suffered any harm that would

"dissuade[] a reasonable worker from making or supporting a charge of discrimination."

Bridgeforth, 721 F.3d at 663.  The training requests were ultimately approved, and Smith points

to no evidence that she was adversely affected by a longer-than-desired waiting period prior to

their approval.  Second, Smith points to no evidence permitting a reasonable inference of

retaliatory motive—for instance, in the form of similarly situated comparators.  On the other side

of the scale, there is evidence supporting the agency's legitimate explanation for initially denying

---

[13] The SBA claims these assignments were made as reasonable accommodations, but the cited deposition testimony either does not support that contention or is not in the record.  See Def.'s MSJ 37 (citing Ex. 44 at 64:6–8 [not in record]); Def.'s Reply 22 (citing Ex. 90 at 28:2–10 [inapposite]).

her requests:  Smith's Charlotte location meant that travel funding was almost always necessary to attend the SBA training, and the agency's budgetary strain during this period meant such funds were scarce.  See Def.'s MSJ, Ex. 8 at 147:11–21; Ex. 17 at 62:13–18.  This is consistent with Smith's concession that, well in advance of her EEO activity, her requests for training were being denied.  See Pl.'s Opp'n, 42 n.8.  For these reasons, Smith fails to make out a successful claim that the (initial) denials of her training requests were retaliatory.

c.   Reasonable-Accommodation Request

Smith submitted a reasonable-accommodation request to the EEO Office in May 2014, seeking a 100-percent telework schedule and a transfer to another SBA department.  See supra section I.C.3.  The SBA granted Smith's telework request but denied the transfer request, on the grounds that there was "no indication that [Smith] [was] unable to perform any essential functions of her positions."  Def.'s MSJ, Ex. 62.

On this record, no reasonable inference is possible that Tran, Smith's supervisor at the time, denied her transfer request for retaliatory reasons.  Indeed, it is difficult to see how the SBA's legitimate rationale for the denial—compliance with the agency's reasonable accommodation policy—could be more airtight.  The SBA's Standard Operating Procedure for reassignment as a reasonable accommodation provides that reassignment should "be used only as a last resort in cases where there is no other effective form of reasonable accommodation," and where an "employee becomes unable to perform the essential functions of [a] position, even with [other] reasonable accommodation[s]."  Def.'s MSJ, Ex. 52 at 41–42.  This was the policy Tran relied upon when she first denied Smith's request, explaining that Smith had shown no indication she was unable to perform any essential job functions.  See Def.'s MSJ, Ex. 56.  And, after further review of Smith's medical documentation, Tran's decision was affirmed *twice* on the

same grounds—first by the SBA's Reasonable Accommodation Review Committee, see Def.'s

MSJ, Ex. 57, and then by the Federal Occupational Health Service, see Def.'s MSJ, Ex. 61.  For

her part, Smith points to no evidence of pretext.

> d.  Train-the-Trainer Event

The Court previously explained that in June 2014, the SBA had planned for Smith to help

facilitate certain "train-the-trainer" sessions via webinar, but that soon before the date of the

event, Smith was notified that there would be no call-in (and that she would no longer be

participating).  See supra section I.C.4.

Admittedly, it is unclear from the evidence who made the decision to cancel Smith's

participation, and why that decision was made.  (Watkins indicated Smith's particular expertise

was not needed for the training, Pl.'s Opp'n, Ex. 25 at 8:9–21, while Tran was of the view that

Smith did not participate "due to [the] lack of proper technology,"  Def.'s MSJ, Ex. 83 at ¶ 5.)

However, Smith's claim still fails because she has not identified any harm resulting from her

inability to help facilitate a single training series that would "dissuade[] a reasonable worker

from making or supporting a charge of discrimination."  Bridgeforth, 721 F.3d at 663.  Indeed,

she received an overall "extraordinary" or "5" rating—the highest available—for the relevant

evaluation period, stretching from October 2013 to September 2014, along with a performance

bonus based on that award.  See Def.'s MSJ, Exs. 63–64.  Separately, because Smith was

excluded from the training nearly six months after she filed her EEO complaint, the action "is

not likely to qualify for . . . a causal inference" of retaliation.  Moore v. Castro, 192 F. Supp. 3d

18, 44 (D.D.C. 2016).  For these reasons, her claim regarding the "train-the-trainer" event cannot be sustained.[14]

## IV.  Conclusion

For the reasons outlined above, the Court will grant the SBA's Motion for Summary Judgment.  An appropriate Order accompanies this Memorandum Opinion.


*Christopher R. Cooper*

CHRISTOPHER R. COOPER
United States District Judge


Date: March 7, 2017

---

[14] Smith also complains that her computer equipment was not connected in the Charlotte office when she returned from medical leave in 2014.  No reasonable inference of retaliation is possible regarding this action.  Watkins sent Smith's computer to the Office of the Chief Information Officer for updating and other IT fixes, and contemporaneous emails show he was engaged with Smith in trying to resolve the issue.  See Def.'s MSJ, Ex. 7 at 55:5–12; Ex. 9B at 23:5–24:10; Ex. 50B at 76.